# Dorrance, Appellant, v. Bristol Borough.

*Water companies—Exclusive privilege—Boroughs—Contract.*

1. Where a water company lays its pipes in the streets of a borough without the permission of the borough, and without any contract with the borough at the time, and several years thereafter agrees to furnish water for fire purposes alone, but without new construction for merely a fixed period, and without any liability for failure or neglect to provide the supply, and thereafter the borough by a change of its charter acquires the right which it had not theretofore, to construct water works of its own, the borough cannot by injunction be restrained from the construction of such works.

2. In such a case an ordinance passed prior to the contract, and providing that persons, firms or corporations making excavations in the streets "for the purpose of laying water, gas or other pipes shall puddle the dirt in refilling said excavations," is immaterial on the question as to whether a borough has adopted a method of supplying itself with water.

3. A water company which has paid dividends at the rate of ten per cent per annum for twenty years has no exclusive privileges to supply water in a borough.

4. Gas and water companies are not required to obtain permission of a borough to lay pipes in the streets, for the manifest reason that their charter gives them the right to enter upon the streets and lay their mains without such permission. The only authority of a borough over such companies is the right to subject them to police regulation in regard to the streets so as to prevent their impairment for public travel. The borough cannot annul the charter of a gas or water company by prohibiting the company from entering upon and laying its pipes in the streets.

5. A municipality may adopt one of two methods to supply itself with water. It may construct and operate its own works by municipal taxation, or it may contract with a private corporation to construct works and supply the municipality. When it has adopted either of these methods it has necessarily rejected the other, and its authority is exhausted.

6. Where a water company lays its pipes in a street of a borough at a time when the borough has no charter right to construct its own plant, and it appears that the borough held out no inducements to the incorporators of the company to obtain a charter and supply the municipality with water, and did no act disclosing an intention on its part not to exercise its power to construct its own water plant, the borough

after it acquires the right is not precluded from constructing such a plant, even if it had previously entered into a contract with the water company by which the latter supplied water for fire purposes only for a fixed period, and after the termination of such period the company had voluntarily continued the supply of water for fire purposes.

*Boroughs—Construction of water plant—Increase of indebtedness— Acts of April* 3, 1851, *P. L.* 320, *May* 3, 1901, *P. L.* 140, *June* 4, 1901, *P. L.* 362, *March* 14, 1905, *P. L.* 38, *February* 15, 1851, *P. L.* (1852), 674, *June* 9, 1891, *P. L.* 252—*Statutes.*

7. Where a borough incorporated under a special law with no power to create an indebtedness in excess of $10,000, becomes subject to the general borough law of April 3, 1851, P. L. 320, in proceedings instituted under the Act of June 4, 1901, P. L. 362, it will become subject to the Act of May 3, 1901, P. L. 140, giving boroughs the right to erect water works for the use of the public.

8. The Act of June 9, 1891, P. L. 252, relating to the increase of debt of municipalities, applies to all boroughs subject to the general borough act of 1851, and this includes older boroughs which have become subject to the act of 1851 in proceedings under the act of June 4, 1901.

9. A general statute will not repeal a local or special law without negative words, but a general statute will repeal by implication an earlier general statute repugnant to or inconsistent with its provisions.

Argued Feb. 10, 1909.  Appeal, No. 258, Jan. T., 1908, by plaintiffs, from decree of C. P. Bucks Co., Oct. T., 1906, No. 3, dismissing bill in equity in case of G. M. Dorrance et al. v. The Burgess and Council of Bristol Borough et al.  Before FELL, BROWN, MESTREZAT, ELKIN and STEWART, JJ.  Affirmed.

Bill in equity for an injunction.  Before STOUT, P. J.
The facts are stated in the opinion of the Supreme Court.
The court entered a decree dismissing the bill.

*Error assigned* amongst others was decree dismissing the bill.

*Harmon Yerkes*, of *Yerkes, Ross & Ross*, and *D. T. Watson*, for appellants.—The borough of Bristol cannot now repudiate the arrangement with the water company.

It has availed itself of the fruits all these years, and it is not even questioned that the water company, in good faith, has performed it and incurred expenses: White v. City of Mead-

ville, 177 Pa. 643; Wilson v. Rochester Borough, 180 Pa. 509; Boyertown Water Co. v. Boyertown Boro., 200 Pa. 394.

The borough can lose its rights by an election to supply water by a contract, express or implied, or by encouragement, inducements held out to a company to build, or by acquiescence and permission in its providing water for the borough: White v. City of Meadville, 177 Pa. 643; Gas & Water Co. v. Downingtown Boro., 172 Pa. 341; Philipsburg Water Co. v. Philipsburg Boro., 203 Pa. 562.

The charter of Bristol has not been changed or supplemented by later legislation to affect the limit of its indebtedness to $10,000.

If an act regulating affairs of boroughs, etc., either produces or may produce local results, it is void: Scranton School District's Appeal, 113 Pa. 176; Morrison v. Bachert, 112 Pa. 322; Scranton v. Silkman, 113 Pa. 191; McCarthy v. Commonwealth, 110 Pa. 243.

The express repeal of an exception to a statute extends, by so much, the operation of the act: Savings Bank v. Collector, 70 U. S. 495; Smith v. Hoyt, 14 Wis. 252; Blankenburg v. Black, 200 Pa. 629; Warren Borough v. Geer, 117 Pa. 207; Com. ex rel. v. Navle, 2 Walker, 311; Brown v. Phila. County Commissioners, 21 Pa. 37; Jefferson County v. Reitz, 56 Pa. 44; Rhein Bldg. Assn. v. Lea, 100 Pa. 210; Seifried v. Com., 101 Pa. 200, approving Brown v. Phila. County Commissioners, 21 Pa. 37; Kilgore v. Com., 94 Pa. 495; Harrisburg v. Sheck, 104 Pa. 53; Lackawanna County v. Stevens, 105 Pa. 465; Malloy v. Com., 115 Pa. 25.

The taxable and debt limit of Bristol fixed in the act of 1851 was never increased: Malloy v. Com., 115 Pa. 25.

The general act approved May 3, 1901, did not authorize the borough of Bristol to erect new waterworks: Storm v. United States, 94 U. S. 76; Grove v. Hodges, 55 Pa. 504.

*John G. Johnson,* with him *Gilkeson & James,* for appellees.—The water company constructed its works independently of any action by the borough and not in pursuance of any contract therewith.

There was no contract of any kind between the borough and the water company until eleven years after the completion by the latter of its works. The contract then entered into was not for an entire supply of water; was for a limited time; and was expressly made free of any liability by the water company for neglect or failure.

No expenditures were made by the water company under the obligation of any contract with the borough.

After the expiration, in 1892, of the first limited contract entered into in 1886, no new contract was made; but the water company continued to furnish, without any obligation, or for any specific length of time, gratuitously, water for specified purposes.

The borough, antecedently to 1905, possessed no power to construct water works.

Under the circumstances stated in the first five propositions there exists nothing which prevents the borough from constructing its own waterworks: White v. City of Meadville, 177 Pa. 643; Wilson v. Rochester Borough, 180 Pa. 509; Centre Hall Water Co. v. Centre Hall Boro., 186 Pa. 74; Boyertown Water Co. v. Boyertown, 200 Pa. 394; Nelson v. Warren Boro., 200 Pa. 504; Potter County Water Co. v. Austin Boro., 206 Pa. 297; Troy Water Co. v. Troy Boro., 200 Pa. 453; Philipsburg Water Co. v. Philipsburg Boro., 203 Pa. 562; Hastings Water Co. v. Hastings Boro., 216 Pa. 178.

The borough, since 1905, was in possession of all the powers vested generally in boroughs, in the matter of extent of indebtedness and of the right to construct waterworks: Blankenburg v. Black, 200 Pa. 629.

OPINION BY MR. JUSTICE MESTREZAT, April 19, 1909:

This is a taxpayer's bill filed by the plaintiffs to restrain the defendants from erecting a water plant and from increasing the indebtedness of the borough for that purpose. The court below refused the relief prayed for and dismissed the bill. The plaintiffs have appealed. The pleadings raise but two questions which are material and controlling in the disposition of the case: (1) Has the borough by its action or relations with

the Bristol Water Company exhausted its power and thereby precluded itself from erecting waterworks? and (2) has the borough the power to construct a water plant and the authority to increase its indebtedness for that purpose to the extent proposed by the defendants? The learned judge of the court below filed an exhaustive opinion in which he found and stated the facts and his conclusions of law. In reviewing the case and in determining the questions presented for our consideration, we do not deem it essential to consider the correctness of the learned judge's findings of many of the facts which are controverted by the appellants. We will state briefly such of the court's findings of fact as we deem established by the evidence and material to a proper determination of the questions at issue in this court.

The borough of Bristol was originally established by letters patent in 1720, and was re-established by an Act of the legislature September 16, 1785, 2 Sm. L. 343. The charter was amended by an Act approved February 15, 1851, P. L. (1852) 674, by sec. 10 of which it is enacted: "The burgess and council shall have the power to borrow for the use of said borough, any sum or sums of money which they shall deem necessary, . . . . . provided that the whole amount of indebtedness of said borough shall not at any time exceed the sum of ten thousand dollars." By Act of March 14, 1905, P. L. 38, this section of the act of February 15, 1851, was amended by striking out the proviso limiting the amount of indebtedness of the borough.

The burgess and town council of Bristol made application to the quarter sessions of Bucks county to have the borough made subject to the general borough Act of April 3, 1851, P. L. 320, and on September 18, 1905, a decree was entered by the court that the borough "shall hereafter be subject to the restrictions and shall possess the powers and privileges conferred by the aforesaid act, and it is further decreed that the provisions of the former charter of the said borough shall be and they are hereby annulled, so far as they are in conflict with the provisions of said act."

The Bristol Water Company was incorporated August 21, 1874, under the general corporation act of that year for the

purpose of supplying water within the borough of Bristol. It completed the construction of its plant between February and April, 1875, furnishing water to the Pennsylvania Railroad Company in February of that year and for domestic purposes in the following April. The court found: "It (the water company) claimed the right to construct its works and lay its pipes in the borough without the consent of the authorities thereof, and constructed and laid the same without such consent. The borough had nothing whatever to do in the matter of consenting or dissenting. The water company acted entirely independently of it." The only ordinance bearing upon the laying of water pipes in the streets of the borough was passed April 12, 1875, and ordained that "from and after the passage of this ordinance, all persons, firms or corporations making any excavations in the public streets of the borough of Bristol for the purpose of laying water, gas or other pipes shall puddle the dirt in refilling said excavations."

No contract for the supply of water to the borough or upon its account was entered into with the water company until 1886, when it was agreed that the company for the consideration of $600 per annum should, for the period of six years from January 1, 1887, "furnish water to the said borough for fire protection, to hydrants to be erected at points on the present mains of said water company where fire plug branches are now located, and also at the dead ends of present mains, and upon a main that may hereafter be placed upon Buckley street." The borough agreed to expend such sums as should be necessary "in furnishing and laying the necessary pipe and stop valves from the branches in the mains and from the aforesaid dead ends of mains, to the fire hydrants, which connecting pipes and valves were to be the exclusive property of the said water company." It was further agreed that a person designated by the borough could use water for the purpose of cleaning the then public culverts under certain stipulations restricting the use of the water, and that the company should be relieved from liability for failure to supply water for fire purposes or otherwise. At the date of the contract, there were about forty or forty-five fire plugs in the borough which have

been increased to eighty-five plugs. The company of its own volition subsequently laid water mains of a larger size, but it was not in the discharge of any duty imposed by the contract with the borough. Nor did the water company agree to lay any additional mains or pipes or to make any additional distribution. In December, 1892, when the contract was about to expire, negotiations took place between the parties for its renewal for fire protection which resulted in the water company addressing a letter to the borough in which it proposed to furnish water to the borough for fire protection on the terms of the original contract without compensation therefor. The proposition was accepted by the borough, and it endeavored to have the agreement indorsed on the contract, but it did not succeed. Since January 1, 1893, the water company, without any other agreement or understanding, has furnished water to some eighty-five water plugs for fire protection only. Occasionally the use of water has been permitted for flushing the streets. The court finds: "Since 1892 there has been an understanding, revocable at the will of either party, with reference to a supply of water for a limited purpose as above specified."

By an ordinance approved May 21, 1906, the borough of Bristol ordained that its indebtedness should be increased in the sum of $100,000 for the purpose of the erection and construction of waterworks and a filtration plant, and that the increase of indebtedness being more than two per centum and less than seven per centum of the assessed valuation of the borough the question of the increase should be submitted to the voters of the borough at an election to be held on July 10, 1906. The election was held, and by a vote of four to one the assent of the electors was given to the increase of indebtedness. The proceedings taken by the borough to increase the indebtedness were regular and in conformity with statutory authority.

Three days prior to the election, this bill was filed. The court refused the injunction restraining the holding of the election, but granted a preliminary injunction restraining the defendants from increasing the borough's indebtedness, and

from erecting a water and filter plant or entering into any contracts for that purpose, until the further order of court. Subsequently, after a hearing, the court entered a decree that the bill be dismissed. From that decree we have this appeal.

1. Has the borough of Bristol by its action or relations with the Bristol Water Company exhausted its power and thereby precluded itself from erecting waterworks? It was found as a fact by the trial court that the Bristol Water Company for at least twenty years prior to 1905 had declared and paid dividends at the rate of ten per cent per annum. The exclusive privilege of the company to furnish water in that territory granted by its charter was, therefore, lost, and it was within the power of the borough to provide a supply of water by contract with that or any other company: Centre Hall Water Company v. Borough of Centre Hall, 186 Pa. 74; Philipsburg Water Company v. Philipsburg Borough, 203 Pa. 562. And, as against the borough, the charter of the Bristol Water Company did not confer upon it an exclusive privilege to furnish water within the municipal limits: Lehigh Water Company's Appeal, 102 Pa. 515; Freeport Water Works Co. v. Prager, 129 Pa. 605; Commonwealth v. Consumers' Gas Co., 214 Pa. 72. It is claimed by the plaintiffs, however, that the borough is precluded from erecting its own works by its conduct and its relations with the Bristol Water Company. But with this contention we cannot agree. We are clear that the learned court below was right in holding the contrary, and that there was no action on the part of the borough that would prevent it constructing a water plant either on the ground of estoppel or by having exhausted its authority to supply water for its own use. The water company was chartered under the act of 1874 and it had the authority to enter upon the streets of Bristol borough and lay its mains and construct its plant without permission of the borough. In fact, this is the very thing it did. It made no contract with the borough and sought no permission of it to construct its plant. The company was not organized or created under or in pursuance of any arrangement or contract with the borough for the purpose of supplying the municipality with water. The fact that some

of the citizens urged the incorporation of the company for the purpose and took stock in the company does not bind the borough in any way whatever. There was no official action by the borough authorities in regard to the matter which would bind it. The ordinance of April 12, 1875, cannot be construed as consent or permission by the borough for the water company to enter upon the streets for the purpose of laying its pipes, nor does it appear that the company entered upon the streets in pursuance of such authority. The ordinance was simply a street regulation of general applicability and applied to "all persons, firms or corporations making any excavations in the public streets," and required them to puddle the dirt in refilling the excavations, with a proviso that in "laying pipes other than for gas and water," they should first obtain permission of the borough. Gas and water companies are not required to obtain permission of a borough to lay pipes in its streets, for the manifest reason that their charters give them the right to enter upon the streets and lay their mains without such permission. The only authority of a borough over such companies is the right to subject them to police regulation in regard to the streets so as to prevent their impairment for public travel: Act of April 29, 1874, cl. 2 of sec. 34, P. L. 73, as amended by sec. 2 of the Act of May 16, 1889, P. L. 226. The borough cannot annul the charter of a gas or water company by prohibiting the company from entering upon and laying its pipes in the streets.

As held in Carlisle Gas & Water Company v. Carlisle Water Company, 188 Pa. 51, a municipality may adopt one of two methods to supply itself with water. It may construct and operate its own works by municipal taxation, or it may contract with a private corporation to construct works and supply the municipality. When it has adopted either of these methods it has necessarily rejected the other and its authority is exhausted. In the case in hand, the municipality was not vested with power authorizing it to construct a water plant prior to 1905. It was chartered by a special act of the legislature which conferred no power to supply water to the public. It is clear, we think, that until it became subject to

the general borough Act of April 3, 1851, P. L. 320, Bristol borough was without authority to supply itself with water by constructing its own plant.

There was no inducement held out by the borough to the incorporators of the company to obtain a charter and supply the municipality with water, nor was there any other act by the borough which disclosed an intention on its part not to exercise its power to supply water to the municipality and thereby deprive itself of the right to construct its own water plant. The learned court below was clearly right in finding that "no expenditure was made by the water company in the way of original construction, or subsequent extension, in consequence of any contract obligation which obliged it to construct or extend." It is earnestly contended by the appellants that the contract of December 4, 1886, was an election by the borough to supply the municipality with water, and that such action precluded it from subsequently constructing its own plant. This contention overlooks the terms and conditions of the contract. The contract certainly did not induce the incorporation of the company, as it was not executed for more than eleven years after the erection of waterworks. The duration of the contract was six years. It did not provide for a supply of water to the borough generally, but for a specified purpose. There was no provision for water for cleaning or flushing a sewer system, and there was a stipulation against liability on the part of the company for failure to supply water for fire purposes. The consideration was a certain sum payable annually. The contract did not provide for laying any additional mains or pipes, or that the company should lay pipes of any particular dimensions. It is obvious, therefore, that both of the contracting parties, entering into the agreement, considered the contract as a temporary arrangement for supplying water for a specified purpose; and that the contract was to have the same force and effect as if entered into between the company and any other consumer in the borough.

We do not overlook the fact, suggested by the appellants, that the company by undertaking to furnish the water was

required to furnish the means to accomplish the purpose. The same would be true if the company had agreed to furnish water to an individual or a corporation. The fact that it had to supply the means with which to carry out the purpose would not be an inducement to construct the plant, in view of the fact that the plant had been constructed eleven years prior to the contract and that there was no duty imposed by the contract to extend the plant. In this connection it should be noted that if any additional mains or pipes were laid, it was the voluntary act of the company and not by virtue of a duty imposed by its contract with the borough. The fact that the company was incorporated for the purpose of supplying water in the borough of Bristol and that it would have to provide the means for so doing was not, as argued by the appellants, a provision made by the state for furnishing water to the municipality so as to preclude the latter from erecting its own plant. The water company, complying with the statute, was entitled to a charter from the state, but without some act by the municipality depriving it of the right, the company could not prevent the borough from exercising its power to construct and operate its own water plant.

The contract of 1886 terminated on January, 1, 1893, and was not renewed. In December, 1892, there were negotiations by the parties for its renewal for fire protection, but they were not successful. The water company, however, addressed a letter to the borough saying that it would continue to furnish water for fire protection on the terms and conditions of the contract without compensation therefor. The borough accepted the offer and attempted to have an agreement indorsed on the contract, but did not succeed. By this arrangement the water company proposed to furnish a limited supply of water for some of the purposes required by the borough. The duration of this supply would, of course, depend upon the pleasure of the company and the borough. The obvious objection by the borough to this proposal was that it did not agree to furnish sufficient water for all borough purposes, was revocable at any time by the company, and protected the water company against liability for failure to

supply water.  It needs no argument to show that the municipality would not comply with its corporate duty to supply water by an arrangement of this character.  It is wholly insufficient and does not meet the duty imposed by law upon the borough to furnish an adequate supply of water.  The appellants contend that it is immaterial whether this arrangement was determinate or indeterminate.  With this contention we do not agree.  If it be determinate, as it unquestionably is, the company may at any time decline to continue to furnish water to the borough for the purposes named in its offer.  The court could not compel the company to specifically comply with the offer, and continue on the same terms to furnish water for such purposes.  The consequences to the borough of a sudden discontinuance of water, entirely possible, discloses the necessity for the borough having a binding obligation which it can enforce.  The water company cannot be permitted to deprive the borough of making sufficient provision for furnishing an adequate supply of water for all its wants by a simple gratuitous offer, determinable at any time, to furnish a partial supply for municipal purposes.  An agreement or an arrangement of that kind is lacking in mutuality and if legally enforcible would impose a responsibility upon the borough without a corresponding responsibility on the water company.

2. Has the borough the power to construct a water plant, and the authority to increase its indebtedness for that purpose?  Prior to 1901, Bristol borough did not possess the power to construct water works or to create an indebtedness in excess of $10,000.  In September of 1905 by a decree of the court of quarter sessions of Bucks county, in a proceeding instituted under the Act of June 4, 1901, P. L. 362, 1 Purd. (13th ed.) 481, the borough was made subject to the general borough act of April 3, 1851.  This decree made the borough subject to the restrictions imposed, and invested it with the powers and privileges conferred by the act of 1851.  It annulled the provisions of the former charter so far as they were in conflict with the provisions of the act.  The act of 1851 confers the power "to provide a supply of water for the use of

the inhabitants, to make all needful regulations for the protection of pipes, .... reservoirs and other constructions or apparatus and prevent the waste of water so supplied" in a municipality subject to its provisions. By the Act of May 3, 1901, P. L. 140, 1 Purd. (13th ed.) 501, it is enacted: "Every borough of this commonwealth shall have power and authority to provide a supply of water for the use of the public within such borough, either by erecting and operating waterworks or by entering into a contract or contracts with one or more persons or corporations authorized to supply water within the limits of said borough, or partly by the erection and operation of waterworks and partly by entering into a contract or contracts, as aforesaid." Assuming the correctness of the position, stated above, that Bristol borough had not by contract or its relations with the water company precluded itself from establishing a water plant, it is clear that the borough is empowered by statutory authority to construct a plant, if it is authorized to increase its indebtedness for that purpose. This question must be resolved by an examination of the legislation on the subject.

As we have seen, the borough was originally established by letters patent in 1720, and was re-established by the act of 1785. By the act amending the borough's charter, approved February 15, 1851, it was provided in sec. 10 that the indebtedness of the borough shall not at any time exceed $10,000. By cl. 26 of sec. 2 of the general borough law of 1851 a borough is authorized to borrow money not exceeding $1.00 in every $100 of the assessed value of the real and personal estate in the borough. It is contended by the appellants that the present debt limit of Bristol borough is either $10,000 or $1.00 in the $100, and, in either event, the borough cannot borrow $100,000, as proposed, for the erection of a water plant. In other words, the appellants' contention is that the proviso of the act amending the charter of Bristol borough which limits the indebtedness to $10,000 is not inconsistent with the borrowing limitation in the general borough act; and that those restrictions on the power to borrow or to create an indebtedness are still in force, notwithstanding the Act of

June 9, 1891, P. L. 252, 3 Purd. (13th ed.) 2723, enacted to carry into effect art. IX, sec. 8 of the present constitution and which provides, inter alia, as follows: "The indebtedness of any county . . . . borough . . . . or other municipality or incorporated district in this commonwealth may be authorized to be increased to an amount exceeding two per centum, and not exceeding seven per centum, upon the last preceding assessed valuation of the taxable property therein, with the assent of the electors thereof, duly obtained at a public election to be held in the said district or municipality."

We are not inclined to the view of the learned counsel for the appellants that the limitation either of $10,000 or of $1.00 in every $100 is still in force as to boroughs subject to the act of 1851. That is an act entitled, "an act regulating boroughs," and provides in detail for the government of boroughs generally of the commonwealth, and repeals all laws inconsistent therewith. The decree of the quarter sessions of Bucks county annulled the charter of Bristol borough so far as it was in conflict with the general borough act, and subsequent to the decree, Bristol borough occupied the same position as a borough originally incorporated under the general borough law, except in so far as any provisions of its charter were not in conflict with the general borough act. The limitation of $10,000 in the Bristol special act, assuming, as contended, the repealing Act of March 14, 1905, P. L. 38, to be unconstitutional, is not the same as the limitation of $1.00 in each $100 provided in the general borough act. The debt limit in the act of 1851 is indefinite, and would depend, each year, upon the assessed value of the real and personal property of the borough. The limitation, therefore, might be greater or less than that in the Bristol special act, and never would be the same save by a coincidence which would rarely, if ever, occur. The probability is that the $10,000 limitation would be less than that provided in the general borough act. In being made subject to the general borough act, therefore, Bristol would not, as provided in the decree of the quarter sessions, possess the powers and privileges conferred by the act. We think the limitations in the two acts are not the same but are incon-

sistent and in conflict with each other, and hence the limitation on the borrowing capacity imposed by the Bristol special act and all other inconsistent provisions thereof are repealed.

We are of opinion that the act of June 9, 1891, applies to all boroughs subject to the general borough act of 1851. In terms it applies to "any county, borough or other municipality or incorporated district of this commonwealth." The purpose of the legislation was to enforce the constitutional mandate, to procure uniformity on the subject in the laws regulating the municipalities of the state, and to confer authority to increase the indebtedness of municipalities in the manner pointed out in the act. Uniformity in the laws governing and regulating the boroughs of the commonwealth was the purpose in enacting the statute of June 4, 1901, permitting boroughs with special charters to become subject to the general borough law; and it is equally manifest, we think, that such was the purpose of the act of 1891 as to the subject of which it treats.

If we hold that the act of 1891 has no application to boroughs subject to the general borough law, its operation would indeed be limited, and we would be imposing a restriction not contemplated by the legislature in enacting the statute. It is true that neither it nor the act of 1874 contains a repealing clause; nor is either of them entitled a supplement to the general borough act, but this is not sufficient to prevent the applicability of the provisions of the act of 1891 to municipalities within the express terms of the statute. A general statute will not repeal a local or special law without negative words, but a general statute will repeal by implication an earlier general statute repugnant to or inconsistent with its provisions. The decree of the quarter sessions made the borough of Bristol subject to the act of 1851 which is a general, and not a local, statute, and its provisions which are inconsistent with the act of 1891 are necessarily repealed by the latter act. The purpose of the legislature was to make the act of 1891 a part of the system regulating all boroughs within the commonwealth, and there was no intention of excluding its operation from any borough subject to the provisions of the general borough law. Uniformity on the subject, dealt

with in the act, among all boroughs, was the purpose of its enactment. If Bristol borough possesses all the powers and authority and has all the rights of a borough incorporated under the general borough act of 1851, we are unable to see why it is not within the provisions of the act of 1891 and why it does not possess the authority conferred by that act to increase its indebtedness within the restrictions named in the act.

We think it clear, without discussion, that the electors of the borough legally authorized the creation of the indebtedness for the erection of the waterworks. The proper steps were taken, and the proceedings were entirely regular. The question of the authority of the borough to increase its indebtedness for the purpose of constructing a sewage system need not be discussed nor determined in this proceeding. We are only concerned here with the right of the borough to erect a water plant. Whether it should be constructed before the sewage plant is a question for the legislative authority of the municipality. So far as we can see there has been no abuse of discretion by the borough in the proceedings to construct the water plant and to provide for the indebtedness, and therefore the courts cannot interfere.

The decree of the court below is affirmed.